IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GAYFLOR NAWUOH, et al.,              :
                                     :
            Plaintiffs,              :    CIVIL ACTION
                                     :
       v.                            :    NO. 09-CV-5817
                                     :
VENICE ASHBY CMTY. CTR.,             :
et al.,                              :
                                     :
            Defendants.              :

**MEMORANDUM AND ORDER**

**Joyner, C.J.**                                    **July 19, 2011**

       Before this Court are the Motion for Summary Judgment of
Defendants Bucks County Housing Authority and Venice Ashby
Community Center (Doc. No. 20) and Plaintiffs' response in
opposition thereto (Doc. No. 24).  For the reasons set forth in
this Memorandum, the Court grants the Motion as to Counts I and
II of the Amended Complaint, declines to exercise supplemental
jurisdiction over the state-law claims against these Defendants,
and dismisses Counts III and IV against them without prejudice.

**I.  BACKGROUND**

       This case arises out of the tragic death of second grader
Emerson Nawuoh, who was fatally struck by a motor vehicle on the
evening of December 6, 2007.  Prior to the accident, Emerson, a
resident of the Venice Ashby housing project, had been at the
Venice Ashby Community Center.  The Community Center was a room
that hosted, among other things, an after-school homework program
for children who resided at the housing project.

The Venice-Ashby Residents Council–a nonprofit organization composed of residents of the Venice Ashby housing project, created to benefit the housing project's residents, (Resident Council Bylaws, Pls.' Resp. Ex. C)–had implemented the homework program at the Community Center.  (Stone Dep. 11:20-12:8, 23:11-13, Defs.' Mot. Ex. C.)  Although the Community Center was in a building owned by the Bucks County Housing Authority, the program was organized and staffed by members of the Residents Council, including Chester Stone, its President, and Sandra Cooper, a board member. (Cooper Dep. 23:5-8, Defs.' Ex. E; Moody Dep. 34:15-20, 35:4-13, Defs.' Ex. D.)  The program generally ran from 4:00 p.m. to 5 or 5:30 p.m., (Stone Dep. 24:23-25:18), and though there was a sign-in sheet, the children could freely come and go. (Id. 25:19-26:16; Cooper Dep. 46:9-12.)  When the program ended, the children generally left on their own; adults seldom picked them up, though younger children were usually accompanied by an older sibling.  (Cooper Dep. 47:24-48:4; Stone Dep. 41:23-42:8.)

Darla Moody, a program director for the Housing Authority at Venice Ashby, was aware that the Residents Council used the Community Center for the homework program and other activities. (Moody Dep. 32:6-24, 33:18-22.)  However, there was no active participation by any Housing Authority employees in the Residents Council's programs, and the Housing Authority employees routinely left before the homework program concluded.  (Id. at 34:15-20, 39:2-40:24.)  Thus, apart from its space being used, the Housing

Authority was not involved in the program's operation.  (Id. at 30:9-24; Moody Dep. 55:19-56:12, Pls.' Resp. Ex. B.)

Prior to the night in question, Emerson had never stayed until the end of the homework program but rather left almost immediately after signing in, leaving his older sister at the program. (Cooper Dep. 44:9-45:24, 48:7-16.)  On December 6, 2007, however, Emerson did stay until closing.  Around 5 p.m., Mr. Stone told the children to clean up because the Girl Scouts would be starting their event in the space.  (Stone Dep. 43:17-23.)  Emerson and other children left through the back door, (Stone Dep. 44:1-12), and at some point soon afterward Emerson ended up in the street outside the building, where he was fatally struck by a passing motorist.

Plaintiffs, as administrators of Emerson's estate, filed suit in federal court against the Housing Authority, the Community Center,[1] the Residents Council, and Mr. Stone.  Count I of the Amended Complaint alleges a "violation of civil rights under color of state law pursuant to the Civil Rights Act of 1871[,] 42 U.S.C. §§ 1981 and 1983."  (Doc. No. 11, at 4.)  Count II is identical, with the exception of the phrase "deliberate indifference" added in parentheses at the end of the heading.

---

[1] There is no evidence in the record that the Community Center is a separate legal entity rather than a physical space in the Housing Authority's building.  The Community Center is represented by the Housing Authority's counsel, however, and will be treated as part of the Housing Authority for purposes of the pending Motion.

3

(Id. at 7.)  Counts III and IV are, respectively, wrongful death and survivorship claims under state law.  (Id. at 9-10.)  All four Defendants are named in each count.

After the close of discovery, the Housing Authority and Community Center filed the pending Motion for Summary Judgment. (Doc. No. 20.)  Although the Motion states that these Defendants are seeking summary judgment "as to all claims against them in the Amended Complaint," (id.), the Memorandum on which Defendants rely discusses only Counts I and II; it does not challenge the state-law claims asserted in Counts III and IV.  (Doc. No. 21.)[2] More specifically, Defendants assert that Plaintiffs have not presented sufficient evidence to support liability under the state-created danger theory.  (Id. at 4.)  They also assert that there has been "no showing that any alleged policy or custom which may have lead [sic] to an underlying Constitutional violation was performed by a State actor."  (Id. at 10-11.)

In response, Plaintiffs acknowledge that their § 1983 claims are based on the state-created danger theory but assert that

_____

[2] Defendants "request that this Honorable Court grant Summary Judgment as to both Counts of the Amended Complaint as the Plaintiff's [sic] have failed to show any Section 1983 violations."  (Doc. No. 21, at 2-3 (emphasis added).)  It is unknown whether this limitation to the § 1983 counts was an oversight or was based on an assumption that the Court would decline to exercise supplemental jurisdiction over the state-law claims if it granted summary judgment on the federal claims.

there is sufficient evidence that all four elements of the state-
created danger test have been met.  (Doc. No. 25, at 1, 5.)[3]

## II.  STANDARD OF REVIEW

"[S]ummary judgment is proper 'if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law.'"  <u>Celotex Corp. v.
Catrett</u>, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P.
56(c)).  "[T]he party moving for summary judgment has the initial
burden of identifying evidence which it believes demonstrates the
absence of a genuine issue of material fact."  <u>Childers v.
Joseph</u>, 842 F.2d 689, 694 (3d Cir. 1988).  "However, where the
nonmoving party bears the burden of proof, [the nonmoving party]
must by affidavits or by the depositions and admissions on file
'make a showing sufficient to establish the existence of [every]
element essential to that party's case.'"  <u>Id.</u> (quoting <u>Celotex</u>,
477 U.S. at 322).  While the facts and inferences must be viewed

---

[3] Plaintiffs also frame Defendants' Motion for Summary Judgment as
predicated on alleged immunity from suit. (Doc. No. 25, at 1.)  The Court
does not read Defendants' Motion as predicated on such immunity:  Defendants
simply note in passing that in their Answer they had "averred that they are
immune from suit pursuant to 42 Pa. C.S.A. § 8522 and the Eleventh Amendment
to the Constitution."  (Doc. No. 21, at 2.)  In contrast, Defendants
explicitly base their Motion for Summary Judgment on the ground that
Plaintiffs failed to show violations of § 1983.  (<u>Id.</u> at 3.)  Assuming
<u>arguendo</u> that Defendants were asserting such immunity, the Court would reject
the argument.  <u>See</u> <u>infra</u> n.8.

in the light most favorable to the party opposing the motion, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), "a nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in its pleadings." Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989) (footnote and citations omitted)).

### III.  DISCUSSION

"[T]o establish a section 1983 claim, a plaintiff must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law." Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996) (internal quotation marks omitted).  "The state-created danger doctrine is an exception to the rule that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." Soberal v. City of Jersey City, 334 Fed. App'x 492, 494 (3d Cir. 2009) (internal quotation marks omitted); see also Sanford v. Stiles, 456 F.3d 298, 304 (3d Cir. 2006).

Although there is a clearly defined four-element test for determining liability under a state-created danger theory, see

6

infra Section III.A, the analysis of liability under this theory
is more complicated when the claims are not simply against
individual defendants but against a government entity—that is,
when municipal liability[4] is asserted.   See M.B. v. City of
Phila., No. 00-5223, 2003 WL 733879, at *5 (E.D. Pa. Mar. 3,
2003) ("While it is clear that the Third Circuit has adopted the
state-created danger theory of § 1983 liability, it has not
squarely addressed the issue of municipal liability when the
underlying constitutional violation is based on the state-
created danger theory.").   Indeed, courts have adopted myriad approaches.
See id. ("When discussing claims against a municipality involving
the state-created danger theory, . . . the Third Circuit has
often addressed municipalities and individual state actors
together or only applied the state-created danger analysis to
individual state actors without reaching the implication of
municipal liability.   Some district courts have interpreted Third
Circuit caselaw to suggest that the 'policy or custom' theory is
a 'separate and distinct analysis of liability from the state-
created danger theory.'   Other district courts, however, read
Third Circuit precedent to create a layered analysis; determining

---

    [4] The general rule of municipal liability, as laid down in Monell v.
Department of Social Services, 436 U.S. 658 (1978), and discussed in detail in
Section III.B, is that a municipality may be held liable under § 1983 only if
it has a "policy or custom" that is the "moving force" behind a constitutional
violation.   Sanford v. Stiles, 456 F.3d 298, 314 (3d Cir. 2006).

first whether an individual state actor violated a plaintiff's substantive due process rights under a state-created danger theory and then determining a municipality's liability under the 'policy, custom, or practice' theory derived from Monell and its progeny.  While some courts have attempted to construct a hybrid, I believe those attempts only make more muddy what is becoming murkier." (citations omitted)).

This Court agrees with M.B. that "[i]t is clear . . . that the Third Circuit contemplates that proving a constitutional violation of state actors under the state-created danger theory by itself is not enough to implicate municipal liability.  Thus, an additional analysis is required in order to attach municipal liability."  Id. at *6.  What is less clear is whether the Monell analysis must still be conducted when the court concludes that there is no liability under the state-created danger theory. Compare Solomon v. Phila. Hous. Auth., 143 Fed. App'x 447, 457 n.15 (3d Cir. 2005) ("A public entity . . . may be liable under § 1983, even though no government individuals were personally liable." (internal quotation marks omitted)), and Kneipp, 95 F.3d at 1213 ("[O]n remand, the district court must evaluate the municipal liability claims . . . , notwithstanding the outcome as to the claims against the individual police officers [under the state-created danger theory].")), with Sanford, 456 F.3d at 314

("[I]t is possible for a municipality to be held independently liable for a substantive due process violation even when none of its individual employees is liable.  However, . . . in order for municipal liability to exist, there must still be a violation of the plaintiff's constitutional rights."), <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 423 n.2 (3d Cir. 2006) ("If we determined the Kauchers had alleged a deprivation of a constitutional right [under the state-created danger theory], we would proceed to determine . . . whether the County of Bucks could be held liable. . . . Because we conclude the Kauchers have not alleged a constitutional violation, our inquiry . . . proceeds no further."), <u>and</u> <u>Malar v. Delaware County</u>, No. 08-0960, 2009 WL 3493775, at *12 (E.D. Pa. Oct. 23, 2009) ("Because I have concluded that there was no constitutional violation [under the state-created danger theory] in this case, Malar's <u>Monell</u> claim against the governmental agency also fails as a matter of law.").

Consequently, in an abundance of caution, this Court will analyze liability under the state-created danger theory and, despite concluding that there is no liability under it in this case, <u>see</u> <u>infra</u> Section III.A, address the viability of a <u>Monell</u> claim assuming that there had been a constitutional violation.[5]

_____

[5] As noted <u>supra</u>, a § 1983 claim requires both a violation of federal law and that the violation was committed under color of state law.  Because the Court concludes that Plaintiffs have not presented sufficient evidence of a violation of federal law, and considering that the parties do not address

## A.  State-created danger

        To prevail on a state-created danger claim in the
Third Circuit, a plaintiff must prove the following
four elements: (1) the harm ultimately caused was
foreseeable and fairly direct; (2) a state actor acted
with a degree of culpability that shocks the
conscience; (3) a relationship between the state and
the plaintiff existed such that the plaintiff was a
foreseeable victim of the defendant's acts, or a member
of a discrete class of persons subjected to the
potential harm brought about by the state's actions, as
opposed to a member of the public in general; and (4) a
state actor affirmatively used his or her authority in
a way that created a danger to the citizen or that
rendered the citizen more vulnerable to danger than had
the state not acted at all.

Sanford, 456 F.3d at 304-05.  The fourth element requires the

plaintiff to "(1) show that a state official affirmatively acted

to the plaintiff's detriment and (2) establish direct causation

between the affirmative act and the result."  Soberal, 334 Fed.

App'x at 495.  "A plaintiff's failure to satisfy any one of the

four elements defeats his state-created danger claim."  Malar,

2009 WL 3493775, at *7.  See, e.g., Sanford, 456 F.3d at 311

("Given that Sanford has failed to show that Stiles demonstrated

the requisite level of fault, her claim can go no further.").

_____

the "under color of state law" element in any detail, the Court need not reach
this second issue.  See, e.g., Morse v. Lower Merion Sch. Dist., 132 F.3d
902, 905 n.4 (3d Cir. 1997) ("Because we, too, find that plaintiff has failed
to state a claim under the state-created danger theory, we need not address
the question whether the School District or the Daycare Association were
acting under color of state law at the time of Diane Morse's death.").

Plaintiffs argue that the fourth element is satisfied because "the Housing Authority affirmatively maintained and condoned a custom in absolute disregard to [sic] Plaintiff's safety." (Doc. No. 25, at 12.)  While Plaintiffs state generally that the "custom" was "the procedure regarding implementation of the homework club, and unaccompanied dismissal," (id. at 8), a review of the record shows that Plaintiffs are effectively challenging a failure to ensure compliance with the Residents Council's bylaws or with a guidebook for public housing authorities, or a failure to stop allowing the program to operate in its physical space when safety mechanisms or compliance with the bylaws and/or guidebook were lacking, or a failure to train employees on the importance of the supervision of the homework program's participants.[6]  (See id. at 13 ("[T]he Housing

---

[6] Contrary to the arguments Plaintiffs make in their brief, (e.g., Doc. No. 25, at 8, 10), there is no evidence in the record that the Housing Authority required a "written agreement, Lease or Memorandum of Understanding" be entered into with the Residents Council.  Rather, the evidence shows that it was only the Residents Council, through its bylaws, that called for such an agreement or memorandum.  Although the Housing Authority acknowledges that no such agreement or memorandum was developed, this was not in violation of any policy or requirement of the Housing Authority.  Moreover, there is no evidence in the record that the Residents Council bylaws required or even contemplated that any such agreement or memorandum would discuss safety or supervision at the homework program.

Also contrary to Plaintiffs' arguments, (Doc. No. 25, at 10, citing Ex. D), there is no evidence in the record that there were any violations or "contradictions" of the "Housing Authority's own Occupancy Guidebook."  Even more noteworthy, there is no evidence in the record that there even was a relevant guideline that the Housing Authority was supposed to or required to follow.  Plaintiffs simply attached one page from a 2003 U.S. Department of Housing and Urban Development "Public Housing Occupancy Guidebook" that listed "eligible community service activities."  (Pls.' Resp. Ex. D.)

11

Authority failed to follow up and ensure that this [compliance with the Residents Council's bylaws and public housing authority guidelines] was done by allowing the after school program to continue, essentially unsupervised, within their physical plant."); id. ("[T]he Housing Authority[,] being remiss in reaching an agreement with the Residents Council, . . . nevertheless allowed the Residents Council to conduct activities on the Housing Authority's physical premises."); id. at 9-10 (implying there was a "failure of the Housing Authority to adequately train municipal employees").)

> 1.  "Affirmative act" requirement of the fourth element

Although some earlier decisions in this Circuit might have suggested that a state actor's "omission" or "failure to act" could "create" a danger within the meaning of the fourth element, the most recent proclamations by the Third Circuit clarify that a state actor must have taken an affirmative action in order for the fourth element to be satisfied.  See Bright v. Westmoreland County, 443 F.3d 276, 282 (3d Cir. 2006) ("It is important to stress . . . that under the fourth element of a state-created danger claim, 'liability under the state-created danger theory is predicated upon the states' affirmative acts which work to the plaintiffs' detriments in terms of exposure to danger.'  It is misuse of state authority, rather than a failure to use it, that

12

can violate the Due Process Clause." (citations omitted)); <u>Malar</u>,
2009 WL 3493775, at *10 ("The Third Circuit has consistently held
that, to satisfy the fourth element of the state created danger
test, a plaintiff must allege an affirmative action rather than
inaction or omission." (internal quotation marks omitted)).

     For example, in <u>Bright</u>, a defendant police officer failed to
act on the plaintiff's report that a third party was violating
the terms of his probation by continuing to contact his child
victim, the plaintiff's daughter.  443 F.3d at 278-79.  Nor did
the defendant county revoke the third party's probation despite a
probation officer's personally witnessing a violation.  <u>Id.</u>  When
the third party, still on probation, subsequently murdered the
plaintiff's other daughter in retaliation for the report, the
plaintiff sued.  <u>Id.</u> at 279.  The Third Circuit held that the
fourth element was not satisfied under these circumstances, as
the plaintiff was only alleging a "failure to protect" and not
any "affirmative state action" by the defendants.  <u>Id.</u> at 283-84.

     Similarly, in <u>Kaucher v. County of Bucks</u>, the plaintiffs
alleged that the defendant prison officials were liable for their
"conduct in creating dangerous conditions that led to the spread
of infection" and in "failing to offer sufficient medical
treatment to infected inmates and corrections officers."  455
F.3d at 424.  The Third Circuit explained that, though the

13

plaintiffs "frame[d] their claim in terms of actions affirmatively creating dangerous conditions and affirmatively misrepresenting dangers[,] . . . at base, both aspects of their claim allege failure to take actions sufficient to prevent the Kauchers' infections." Id. at 433.  In essence, the plaintiffs were contending that the defendants "failed to act affirmatively to improve conditions at the jail" and "failed to act affirmatively to educate and warn inmates and corrections officers about MRSA and to train them in infection prevention." Id.  Because "failures to act cannot form the basis of a valid § 1983 claim," the fourth element was not satisfied.  Id. at 433 & n.11; see also Moore v. Weisberg, No. 05-1790, 2007 WL 4322988, at *6 (E.D. Pa. Dec. 10, 2007) (holding that there was no affirmative act by a school and its principal when a kindergartner was beaten up by other students on the school bus); Tobin v. Washington, No. 06-5630, 2007 WL 3275073, at *7 (W.D. Wash. Nov. 5, 2007) (finding no affirmative, causative act when the defendant social workers licensed a daycare and a two-year-old subsequently escaped from it and drowned in a lake across the street); Watson v. Methacton Sch. Dist., 513 F. Supp. 2d 360, 378 (E.D. Pa. 2007) (finding no affirmative state act when a parent group held an all-night after-prom party at the high school, students were allowed to drive themselves home, and a student

struck another vehicle); <u>Bennett v. City of Phila.</u>, Nos. 03-5685, 05-0833, 2006 WL 1371189, at *10 (E.D. Pa. May 17, 2006) (holding that a DHS counselor's failure to respond to a child-abuse report was not an affirmative act and thus did not satisfy the fourth element), <u>aff'd</u>, 499 F.3d 281 (3d Cir. 2007).

The case law thus makes clear that the "custom" of the Housing Authority–a failure to train, to ensure compliance, or to stop giving space–is not an "affirmative act" that satisfies the fourth element.  <u>See, e.g.</u>, <u>Watson</u>, 513 F. Supp. 2d at 378 ("Plaintiff's argument that the defendants did not provide alternative transportation, such as a bus, is suggestion [sic] of an omission by Defendants, rather than an affirmative action."); <u>Bennett</u>, 2006 WL 1371189, at *10 ("Maiden's failure to respond to the report may have been incompetent and unconscionable, but his failure does not give rise to a due process violation because 'indefensible passivity' and nonfeasance do not amount to a constitutional violation.").

### 2.  Causation requirement of the fourth element

Even if a failure to act were sufficient under the fourth element, the causation requirement is unmet.  As aptly explained in <u>Armijo v. Wagon Mound Public Schools</u>, "if the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state

would not be liable because it could not have created a danger that already existed." 159 F.3d 1253, 1263 (10th Cir. 1998).

In Morse v. Lower Merion School District, the plaintiff argued that a school district and daycare association operating at the school were liable when a third party killed a teacher after entering through a door that the defendants had left unlocked, in contravention of a school policy requiring that the doors remain locked. 132 F.3d at 904. The Third Circuit found that "it was not defendants' decision to allow the rear entrance to the school to remain open that precipitated or was the catalyst for the attack." Id. at 910. Thus, as a matter of law, the defendants could not have "directly caused" the attack. Id.

Mitchell v. Duval County School Board, a decision from the Eleventh Circuit cited with approval in Morse, is perhaps closest to the facts of the present case. In Mitchell, a fourteen-year-old student had been attending an event at his school. 107 F.3d 837, 838 (11th Cir. 1997) (per curiam). When the event concluded, he asked to use a telephone in the administrative office but was turned away. (Id.) He left to use a payphone and then waited on the edge of the school parking lot for his ride. (Id.) While waiting, he was murdered by third-party assailants in an attempted robbery. (Id.) The court found that the state had not created the danger, as

16

nothing in the school's policy required Mitchell to
wait where he did.  Even if, as appellant alleges,
Mitchell was not allowed to wait inside the
administration office, Mitchell had the option of
waiting either inside the building or immediately
outside. . . . Instead of waiting there, Mitchell stood
a considerable distance away on the edge of the
school's parking lot.  We conclude that it is beyond
doubt that appellant cannot prove a set of facts that
any school policy required Mitchell to wait in an
inherently dangerous location [such that the state
created the danger].

Id. at 839-40; see also Kaucher, 455 F.3d at 435 (holding that

the "one alleged affirmative act" of prison officials-the

issuance of a memorandum discussing MRSA infections-did not cause

the plaintiffs' infections, because "[w]ith or without the

memorandum, jail employees risked MRSA infections"); Watson, 513

F. Supp. 2d at 378 (reasoning that "[t]here was no action by the

Organization or Defendants that required any Party attendee to

stay awake all night or that required an attendee such as Hudome

to drive himself home in any condition, fatigued or not[;] Hudome

was free to leave the Party and was never compelled to be there

or to stay there, but could come or go as his parents

permitted"); Bennett, 2006 WL 1371189, at *8 (holding that the

DHS counselor's closing of the minor's file despite abuse reports

"did not create the danger," as "[t]he source of the danger to

the Bennett sisters was their mother and the people with whom she

chose to leave her children"); Tittensor v. County of Montgomery,

17

No. 02-8011, 2003 U.S. Dist. LEXIS 18159, at *3 (E.D. Pa. Sept. 8, 2003) (holding that the county government and health department did not create the harm when they knew of an E. coli outbreak at a private farm but did not warn patrons or otherwise act and the plaintiff's children subsequently became infected).

Assuming the failure was in not requiring the Residents Council to comply with its bylaws, the Court points out that there is no evidence that the bylaws were to contain safety measures or procedures for the homework program.  If the failure was in not taking away the Residents Council's space for the homework program because of safety concerns or the bylaws issue, the Court must consider that nothing Defendants did required Emerson to attend the program or go in the road.  Defendants simply cannot be said to have created the danger to him.

Likewise, assuming the failure was in not training Housing Authority employees such as Ms. Moody, or even Residents Council members, in the importance of properly supervising children at the Community Center, the Court must consider that Ms. Cooper was already aware of the danger created by Emerson's running across the street and that she repeatedly instructed Emerson to stop. (Cooper Dep. 28:5-16.)  Ms. Cooper also testified that she tried to talk to parents about having their children stay at the Community Center rather than leave on their own but that the

18

parents were not responsive.  (Id. at 26:22-27:17.)  As Emerson

did not heed Ms. Cooper's warnings and parents did not pick

children up from the program despite requests for involvement,

there is nothing to suggest that "training" the adults would have

stopped Emerson from going into the road and, sadly, being struck

by a passing motorist that night.  Accordingly, the fourth

element is not satisfied, and Plaintiffs cannot succeed on their

state-created danger theory.[7]

## B.  Municipal liability[8]

---

[7] Although Plaintiffs' failure to satisfy the fourth element is fatal, the Court also notes that, for the reasons discussed in Section III.B.3, Plaintiffs have not shown that a state actor acted with a degree of culpability that shocks the conscience (in this case, with deliberate indifference).  Thus, the second element of the state-created danger test is also unsatisfied.

[8] Interestingly, the parties do not analyze whether (or under what circumstances) the Bucks County Housing Authority is a commonwealth agency as opposed to a local (i.e., municipal) government.  Defendants simply assert in passing that they are a commonwealth agency, (Doc. No. 22, at 2), while Plaintiffs seemingly assume, by virtue of their Monell analysis, that Defendants are a local government.  Defendants' status is critical, as it determines the permissible circumstances for imposing liability.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 & nn.54-55 (1978) (overruling prior case law to the extent that it had held that a local government was not a "person" subject to liability under § 1983, permitting municipal liability when there is a municipal policy or custom causing the violation, but expressly limiting the holding to "local government units which are not considered part of the State for Eleventh Amendment purposes").

Having conducted its own research, this Court concludes that the Housing Authority is considered a local government for purposes of § 1983 claims.  See Solomon v. Phila. Hous. Auth., 143 Fed. App'x 447, 456 n.14 (3d Cir. 2005) ("While statutes of the Commonwealth state specifically that a housing authority organized under the Housing Authorities Law 'shall in no way be deemed to be an instrumentality of [a] city or county, or engaged in the performance of a municipal function,' 35 Pa. Cons. Stat. § 1544, this is not dispositive of the federal qualified immunity analysis.  After Monell, it is clear that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies. . . . [W]e find that PHA is within the definition of 'person' as a local government entity for purposes of § 1983 liability."); Swift v. McKeesport Hous. Auth., No. 08-0275,

A court must "separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and if so, (2) whether the city is responsible for that violation." Mark v. Borough of Hatboro, 51 F.3d 1137, 1149-50 (3d Cir. 1995) (internal quotation marks omitted).  For the municipality to be responsible, Plaintiffs must show (1) a municipal policy or custom, (2) that caused the violation, and (3) a culpable state of mind-specifically, deliberate indifference.  See generally Sanford, 456 F.3d at 314; Kneipp, 95 F.3d at 1213.

     1.  Policy or custom

In Monell, the Supreme Court held that

> a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978); see also Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996)

---

2009 U.S. Dist. LEXIS 107113, at *18-19 (W.D. Pa. Nov. 17, 2009) ("Defendant [McKeesport Housing Authority], like the Philadelphia Housing Authority, is a municipality.  Plaintiff will need to show that the alleged deprivations [of due process underlying the § 1983 suit] were the result of a custom or policy of defendant."); Wright v. Phila. Hous. Auth., No. 94-1601, 1994 U.S. Dist. LEXIS 15596, at *5-11 (E.D. Pa. Oct. 31, 1994) (rejecting the Philadelphia Housing Authority's assertion of Eleventh Amendment immunity in a § 1983 suit and finding that it is a "person" that can be liable under § 1983); Vercher v. Harrisburg Hous. Auth., 454 F. Supp. 423, 425 (M.D. Pa. 1978).

("When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom.  Thus, although the municipality may not be held liable for a constitutional tort under § 1983 on the theory of vicarious liability, it can be held responsible as an entity when the injury inflicted is permitted under its adopted policy or custom." (citation omitted)).  "While municipal liability under § 1983 originally hinged on affirmative policies, or customs, modern jurisprudence has extended it to a city's failure to train, supervise and discipline its officers."  <u>Jarlett v. Callis</u>, No. 00-3489, 2001 U.S. Dist. LEXIS 10540, at *12-13 (E.D. Pa. July 16, 2001) (internal quotation marks omitted).

"Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict."  <u>Beck</u>, 89 F.3d at 971 (internal quotation marks omitted).  "Who is a policymaker is a question of state law," and "[i]n looking to state law, a court must determine which official has final, unreviewable discretion to make a decision or take an action."  <u>Id.</u> at 973 n.8 (internal quotation marks omitted); <u>see also</u> <u>Bd. of the County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 417

21

(1997) (Souter, J., dissenting) ("In assigning municipal liability under <u>Monell</u>, we accordingly distinguish an act of a municipal agent without independent authority to establish policy from the act of one authorized to set policy under local law, and we likewise distinguish the acts of lower-level employees depending on whether they do or do not implement or manifest a policy set by those with the authority to set it."). In <u>Solomon v. Philadelphia Housing Authority</u>, the Third Circuit recognized that, "[u]nder the Pennsylvania Housing Authorities Law, a housing authority is governed by a Board of Commissioners which has final policymaking authority." 143 Fed. App'x at 456 (citation omitted).

"A course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials [are] so permanent and well-settled as to virtually constitute law." <u>Beck</u>, 89 F.3d at 971 (internal quotation marks omitted). "Custom . . . may also be established by evidence of knowledge and acquiescence." <u>Id.</u>; <u>see also</u> <u>Colburn v. City of Phila.</u>, No. 00-2781, 2001 U.S. Dist. LEXIS 11653, at *10 (E.D. Pa. Apr. 11, 2001) ("In proving a custom, a § 1983 plaintiff must demonstrate that a municipal policymaker was aware of the practice alleged to be a custom and acquiesced in it.").

As explained <u>supra</u>, Plaintiffs' argument seems to be that the policy or custom is the Housing Authority's failure to train its employees on the importance of supervision of the homework club participants, or a failure to ensure compliance with the Residents Council's bylaws or the guidebook for housing authorities, or a failure to stop allowing the program to operate in its physical space when safety mechanisms or compliance with the bylaws and/or guidebook were lacking.

Whether such a failure is a <u>municipal</u> policy or custom is questionable.  Certainly, there is no evidence of a formal, written policy.  Nor is there record evidence that the Board of Housing Commissioners made any decision concerning the homework program, and the only Housing Authority employee discussed, Ms. Moody, seemingly did not have final decisionmaking authority. (<u>See</u> Moody Dep. 26:13-27:20, 30:19-24, Defs.' Mot. Ex. D.)

Indeed, there is not even evidence that decisionmakers were aware of the homework program.  While Plaintiffs claim that "the Housing Authority was aware that minor children were utilizing the premises and leaving unaccompanied by an adult for a number of years," (Doc. No. 25, at 11), there is simply no evidence that anyone in the Housing Authority beyond Ms. Moody knew that children left the program on their own, and vicarious liability

23

is not permissible in a <u>Monell</u> case.[9]  <u>See</u> <u>Easley v. Phila. Hous.</u>
<u>Auth.</u>, No. 99-4329, 2000 U.S. Dist. LEXIS 11047, at *6-8 (E.D.
Pa. July 31, 2000) (granting summary judgment for the PHA on a
claim that it had a custom of not disciplining its officers,
based on an officer's allegedly using excessive force in the past
but not being disciplined, because the plaintiff did not have
evidence that a policymaker had knowledge of the previous
findings of misconduct).  It is also unclear for how long the
program, which was voluntary, had been running, such that it
might not have had the "force of law."  <u>Compare</u> Cooper Dep.
24:21-25:4, 46:9-12, <u>and</u> Stone Dep. 24:9-26:16, <u>with</u> <u>Watson</u>, 513
F. Supp. 2d at 380 ("The planning and hosting of such all-night
post-prom celebrations once per year for four consecutive years,
for which attendance was voluntary and parental permission
mandatory, and allowing attendees to drive themselves home, even
if 'sleep-deprived,' is not so permanent and well-settled as to
have the force of law.").  Even if there were a "policy or
custom" within the meaning of <u>Monell</u>, however, causation and
culpability are missing.

### 2.  Causation

---

[9] In fact, the only testimony on the subject is that the Housing
Authority did <u>not</u> know that the children could come and go as they pleased.
(Cooper Dep. 56:6-11, 56:22-58:3, Defs.' Mot. Ex. E.)

As noted above, "proof of the existence of an unlawful policy or custom alone is insufficient to maintain a § 1983 action.  The plaintiff bears the burden of proving that the municipal practice was the proximate cause of the injuries suffered."  Beck, 89 F.3d at 972 n.6; see also City of Canton v. Harris, 489 U.S. 378, 385 (1989) (stating that, "in any case alleging municipal liability under § 1983," there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation").

As explained above in Section III.A.2, any failure to train Housing Authority employees, to ensure compliance with the bylaws or guidebook, or to stop the Residents Council from operating its program on the premises is too far removed from a passing motorist's accidental striking of the plaintiff to be considered the proximate cause of the tragedy.  Hence, Plaintiffs have failed to show that there is a genuine dispute of material fact as to the causation element required for municipal liability, and summary judgment for Defendants is appropriate.

### 3.  Culpability

Moreover, "[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision."  Brown, 520 U.S. at 411.  "'[D]eliberate

indifference' is a stringent standard of fault, requiring proof
that a municipal actor disregarded a known or obvious consequence
of his action."  Id. at 410.  In the failure-to-act context,

> If a program does not prevent constitutional
> violations, municipal decisionmakers may eventually be
> put on notice that a new program is called for.  Their
> continued adherence to an approach that they know or
> should know has failed to prevent tortious conduct by
> employees may establish the conscious disregard for the
> consequences of their action–the 'deliberate
> indifference'–necessary to trigger municipal liability.

Id. at 407; see also M.B., 2003 WL 733879, at *6 ("Although it is
possible to maintain a failure to train or supervise claim
without demonstrating a pattern, the burden on the plaintiff is
high, requiring a showing that a violation of federal rights is
'highly predictable' in order to meet the deliberate indifference
standard.").

Plaintiffs argue that Defendants were deliberately
indifferent because there was a "period of repeated misconduct
and failure to implement safeguard policies and procedures on the
part of the Housing Authority . . . . The Housing Authority
required an agreement and Memorandum of Understanding for use of
their facility by the Residents Association yet failed to
implement or oversee their own policies."  (Doc. No. 25, at 7.)
As pointed out supra n.6, the Housing Authority did not have such
a requirement.

26

In any event, Plaintiffs have not presented <u>evidence</u> of deliberate indifference.  For example, there is no evidence of other incidents involving harm to children either at the Community Center or when leaving it, let alone that Ms. Moody or other Housing Authority officials were aware of any.  (<u>See</u> Cooper Dep. 58:15-60:2; Moody Dep. 77:12-21, Defs.' Mot. Ex. D.) <u>See also</u> <u>Sanford</u>, 456 F.3d at 314 (affirming summary judgment for the school district after a student committed suicide when, among other things, "there [wa]s no evidence of a pattern of student suicides in the district," "[n]or [wa]s there evidence that the policy [regarding students who mentioned suicide] had failed in the past"); <u>Watson</u>, 513 F. Supp. 2d at 376 ("[N]o reasonable juror could find that the defendants consciously disregarded an obvious risk of harm.  Defendants had not received complaints in prior years about attendees' condition following any post-prom celebration . . . .").

Although Ms. Moody knew children left the program without an adult, (<u>see</u> Moody Dep. 66:13-18, Defs.' Mot. Ex. D), this does not mean that she was deliberately indifferent to the danger of a child being struck by a passing motorist, rather than, perhaps, negligent.  <u>See</u> <u>Watson</u>, 513 F. Supp. 2d at 376 ("Whether it would have been a good idea for the organizers and supervisors of the Party to provide alternative transportation, or even forbid

27

attendees from driving themselves home, is not the question before the court in determining whether this [culpability requirement] has been met.  This court 'must evaluate defendants' decisions at the time they were made.'" (quoting <u>Kaucher</u>, 455 F.3d at 428)); <u>see also</u> <u>Tobin</u>, 2007 WL 3275073, at *7 (finding no deliberate indifference by the government in licensing a daycare from which a two-year-old subsequently escaped and drowned); <u>supra</u> Section III.B.1 (distinguishing the state of mind of an employee from a municipal decisionmaker).  Thus, the culpability element required for municipal liability is missing, and summary judgment for Defendants is also appropriate on this ground.

## IV.  CONCLUSION

For the foregoing reasons, the Court grants the Motion for Summary Judgment of Defendants Bucks County Housing Authority and Venice Ashby Community Center as to Counts I and II of the Amended Complaint.  As there are no other federal claims against these Defendants, the Court declines to exercise supplemental jurisdiction over the state-law claims asserted against them in Counts III and IV.  Consequently, Counts III and IV of the Amended Complaint are dismissed without prejudice to Plaintiffs' refiling them in state court.